UNITED STATES, Respondent, v. THE LATE COR-
PORATION, THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS and Others, Appel-
LANTS.

[See *Mormon Church* v. *United States*, 136 U. S. 1; *United*·
*States* v. ·*Church*, 5 Utah, 361, 394, 538; *United States* v.
*Church*, 6 Utah, 69.]

EQUITY.—CHARITABLE USES.— CY PRES.—The˙ doctrine of *cy pres*
in this country is limited to a case where ˙there is an avail-
able charity to an identified or ascertainable object, and a
particular mode inadequate, illegal or inappropriate or which
happens to fail has been prescribed, and if property is devised
to charitable uses in such general terms that it may be
devoted to one or more of several charities, the doctrine of·
*cy pres* is confined to a choice between such objects.

ID.—ID.—ID.—CHOICE OF PURPOSES.—Courts of equity in the
exercise of their ordinary jurisdiction cannot devote any part
of a fund devised to charitable uses to an object not contem-
plated by the donor, but if some of the purposes generally
specified are legal and others are illegal, courts of equity may
devote the fund to such purposes which are legal, as are
within the donor's intention.

ID.—ID.—ID.—CHANGE OF PURPOSE.—Where property is contrib-
uted to a church to be used generally for church purposes,
because one of such church purposes is illegal, the destination
of the fund cannot be made the benefit of the common
schools of the Territory, because such destination is a total
change of purpose, and one not within the intention of the
donors.

ID.—ID.—ID.—MORMON CHURCH.—The personal property of the
disincorporated Mormon church was devoted by the donors to
general church purposes, one of˙ which was the propagation
and encouragement of the practice of polygamy, others of

which were legal, such as the relief of the poor and the building and repair of houses of worship. When the church was disincorporated its real estate was escheated to the United States, but no disposition was made of its personal property, which was left without an owner; *held* that such property should be vested in a trustee to be used for church purposes which were legal, such as the relief of the poor and the building and repair of houses of worship: ZANE, C. J., *dissenting* on the ground that the church having ceased the encouragement of polygamy, the property should be vested in the first presidency of the church, who were designated by the church generally to hold property for the church, to be used for church purposes which they selected as the relief of the poor and the building and repair of houses of worship.

Original proceeding in the supreme court upon exceptions to the report of the master in chancery.

*Mr. William H. Dickson,* for the defendants.

The case now comes before this court on exceptions to the master's report.

The questions presented are interesting and of great importance. It will be conceded that the master, in devising a scheme, and the court in passing upon the same, are to be guided and controlled by the principle or doctrine of *cy pres* as applied to charities, and as exercised by a court of equity judicially; that is to say, by virtue of the power inherent in courts of chancery, as distinguished from the extra-judicial power, or prerogative, sometimes exercised by the chancellor of England under the sign manual.

That the courts are to be guided as above indicated, is manifest from the decision of the Supreme Court of the United States rendered in this case and reported in 136 U. S., as we shall hereafter show.

Since the master was to report a scheme appointing this property to such charitable uses, lawful in their char-

acter, as shall most nearly correspond with the purposes to which it was originally devoted, it will be essential at the outset to ascertain what these purposes were.

It appears that the fund is the offspring of innumerable petty contributions and donations made to the late corporation by its members, from time to time, extending over a period of many years. That these donations were made upon the understanding that the same were to be applied to the religious and charitable uses and purposes of said church by or under the direction of the president or head of said church and his two counselors. That it has been so applied by said church officials, to the building of temples and other places of worship for the members of said church, and to the relief of poor and distressed members of said church and their families. That for many years there has been so applied to the relief and assistance of poor members of said church and their families, from the fund arising from such contributions and donations, an amount more than the annual income of the fund now in question, to wit: more than $50,000. That more than this amount will be required for those purposes annually in the future. It also appears that a large portion of the fund arising from such donations and contributions—of which the fund in question is a part—has been in the past applied by said church officials annually to the building and repair of places of worship for the members of said denomination. That the application made of the said contributions and donations and the proceeds thereof have been, during all the years, reported by said church officials to the members of said church semi-annually, and such application has at all times met with the approbation of all the members of said church, including the donors of said fund. See *Attorney General* v. *Clapham*, 53 Eng. Ch. 590, 625–6.

Since the dissolution of the corporation its members have existed as a voluntary religious association, known as the

Church of Jesus Christ of Latter-day Saints.   This associa-
tion suggested as a proper scheme for the application of
this property, that it be vested in the head of said church
and his counselors and their successors in office in trust,
to invest the same, and to apply the proceeds thereof to
the relief and assistance of the poor and distressed members
of said church and their families, and to the building and
repairing of necessary places of worship for the members
of said church (that the proportion of the income of said
fund to be devoted to each of these uses be determined by
the master and embodied in his report); and that said trus-
tees be required to report to the court annually an account
of their administration of such trust; and we asked the
master to adopt and report such a scheme.

There would be nothing unlawful or opposed to public
policy in such a disposition or use of the fund.   As said
by GRAY, J., in *Saltonstall* v. *Sanders, et al.,* 11 Allen,
455, speaking of what was a good charity: "The assistance
of the poor is required, not only by the moral and religious
duty of every citizen, but by sound public policy and a
regard for the interests of the whole community."   More-
over, such a disposition of the fund, instead of defeating
the benevolent and charitable intent and purpose of those
whose generosity created the same, it would be in exact
execution of at least two of the purposes these people had
in view in making their donations.   This ought to be of
controlling influence, inasmuch as the direction of the
court is that the scheme to be reported shall be one
appointing the fund to such charitable uses, lawful in their
nature, as shall correspond most nearly to the purposes for
which it was originally designed.

We understand the counsel for the government to sug-
gest that the fund should be applied to the use and benefit
of the common schools of the Territory.   This would be a
charitable use quite foreign to that to which it was origin-
ally devoted.   This would not be executing as nearly as was

practicable, and within the law, the intent and purpose of the donors. The fund was contributed for, and devoted to, the relief of the poor of a particular sect, and to the religious uses of such sect. To devote it now to the schools is to apply it to an entirely new and quite dissimilar object, and for the benefit of persons outside of the sect or class by whom it was created, and to whose benefit it was devoted.

We will endeavor to show further on that it is not within the power of any court in this country to do this; if such a power is lodged anywhere with us, it is with the sovereign authority—the supreme law-making power. We will also attempt to show that in the present age, even the sovereign authority, in any civilized country, would refuse to exercise such power in any such arbitrary and oppressive manner.

It will be seen that it was just such abuses of the royal prerogative at an early day in England that threw so much discredit and reproach upon the whole doctrine of *cy pres.*

By this doctrine as judicially exercised in chancery, the court endeavors, when the mode of administering or executing the charity pointed out by the founders has become impossible or impracticable, or the original charity is in part unlawful or opposed to the public policy of the state, to execute the intention of the donors as nearly as the same may be done lawfully. In applying this fund in the manner suggested by the other side, there could be no pretense, or only a pretense of carrying out the intention of the donors. It must be at once manifest to any mind that such an application of the property would be plainly opposed to any and every purpose of the founders of the charity. Whatever else might be said of such a scheme, it could never be said that it was a result of the application of the doctrine of *cy pres* as administered in equity.

The property has been created by the industry and frugality of the Mormon people. It was by them consecrated to religious purposes of that sect, and to the

relief and assistance of the poor of that faith. It will not do to say that this fund can no longer be applied to any charitable use for the benefit solely of the members of that denomination, and which at the same time shall be lawful in its character and within the compass of some of the legitimate purposes which the donors had in view when they made their donations to it. Such a declaration would be at once recognized of all mankind as a wretched pretense—a shallow subterfuge — designed to justify or excuse the spoliation of a people, and will be condemned by an enlightened sense of justice; and yet if such a conclusion cannot be fairly and legitimately reached, the fund here in question cannot be disposed of in the manner suggested by counsel for the government without ignoring the direction of the Supreme Court of the United States. We have to deal with property which has been earned and accumulated by a particular sect, and which has been devoted to certain charitable purposes in which the members of that sect alone are interested, and by which they alone are benefited. To wrest this property from them, and to apply it to charities entirely foreign to those to which it was originally destined, in which they are not alone interested, but for the benefit of the general public, and this notwithstanding it may well be applied to charities which are not only lawful but eminently praiseworthy, and in which those only whose property it was are interested, charities too which are clearly within the scope and purpose of those who founded the original charity, would; we submit, prove a lasting shame and disgrace to the nation, whether the wrong was perpetrated through its courts or by its legislature.

The objection pointed out by the Supreme Court of the United States to setting this personal property aside to the uses and purposes of, or in trust for the members of, the late corporation, unconditionally, was founded

upon the finding made by the Supreme Court of the Territory of Utah to the effect that at and prior to the time of the dissolution of the corporation, this property had been used in the promulgation and spread of the doctrines of the church, one of which doctrines was polygamy, and that since the dissolution the members of said church as a voluntary religious sect upheld the same doctrines and tenets. See 136 U. S. pp. 27–8 50; see also 140 U. S. 665.

We submit that it is apparent from both opinions of the United States Supreme Court that the only objection to the setting aside of this property to and 'in trust for the voluntary religious association generally and unconditionally, was the fact that polygamy was still upheld and practiced by the members of that association, and the assumed fact that this property had been used for the spread and growth of that doctrine and would be likely to be so used while the same continued to be a tenet of the faith, if the court imposed no restraint upon its use. The court below had not found, except inferentially, that the property had been used in whole or in part at any time to promulgate or spread that doctrine, and we claim that it was not so used in fact. However that may be, the proof shows that the practice has been forbidden and is permanently and in good faith abandoned. No one can read the decision of the Supreme Court of the United States and escape the conclusion that, in the opinion of that tribunal, this obnoxious doctrine being eliminated, the fund ought to be applied to the religious and charitable purposes of that religious association.

But, if polygamy were still a doctrine of the church, and its practice still countenanced and encouraged, and it further appeared that this fund had been devoted to the charitable and religious uses and purposes of the church, and that it had been originally designed by the donors that the fund might be applied to the spread of that

doctrine, or to some other and lawful charitable and religious use of the church, it would not be permissible for the court to apply it to an entirely different charitable use from that originally designed. But the court should, in such case so limit or appoint the fund as to confine its appropriation to such lawful charities as were within the scope of the purpose and intention of the original donors. When a fund is devoted to charity, and by the terms of the scheme pointed out by the original donor it may be applied in a legal or an illegal manner, a court of equity will make such modification of the original scheme as is necessary to avoid a violation of the law, or to confine the application of the property to the lawful uses designated by the donor. The court has not the power to wrest the fund from the other and lawful charities provided for by the donor, and apply it to other and different charitable uses. In this case the Supreme Court of the United States say (136 U. S. 51) speaking of property which has been devoted to charity: "If it cannot be applied to the particular use for which it was intended, either because the objects to be subserved have failed, or because they have become unlawful and repugnant to the public policy of the state, it will be applied to some object of *kindred* character so as to fulfill· in substance, if not in manner and form, the purpose of its consecration." Boyle on Charities, 232; see also *Attorney General* v. *Parsons*, 8 Veas. 186; *Attorney General* v. *Hinxman*, 2 Jac. W. 270, 274, 277.

See *Jackson* v. *Phillips, et al.*, 14 Allen, 539, where GRAY, J., says, on page 571: "As the trustees named in the will are not a corporation established by law, and these bequests are unlimited in duration, and by their terms might cover an illegal as well as a legal appropriation, it is the duty of the court, before ordering the funds to be paid to the trustees, to refer the case to a master to settle a scheme for their application in a law-

ful manner." And on page 569, he cites the case of
*Isaac* v. *Gompertz,* Ambl. 228, note, in which a bequest
manifestly intended for the benefit of persons professing
a religion not tolerated by law, and which might, accord-
ing to its terms, be applied in either a lawful or an
unlawful manner, was sustained as charitable, and its
application confined to the lawful mode.

It is seen that one of the charities to which a large
portion of the income of the personal property of the
church has been devoted and applied in the past, was the
relief and assistance of poor members of the church and
their families. That the amount so annually applied in
the past exceeds the income that the fund now in question
will yield, and more than such income will be required
annually in the future for this purpose. Here is a charit-
able use, lawful in its character, not opposed to but in
line with, public policy, and in all respects praiseworthy
and commendable. And moreover, it is one of the charita-
ble purposes to which the fund was originally devoted.
What valid objection is there to a scheme limiting or
appointing the fund to this charity? The master was
directed by the court "to report a scheme appointing it to
such charitable uses, lawful in their nature, as will most
nearly correspond to those to which it was originally
destined." Such an application does, beyond all honest
controversy, more nearly correspond to the original use or
purpose than does an application of the fund to the use of
the common schools. Another of the purposes to which a
portion of such donations and the proceeds thereof—of
which this fund is a part—was devoted, and to which the
same was applied in the past, was to the building and re-
pair of temples and other places of worship for the mem-
bers of this faith. This also is a lawful charity. Why
may not a portion of the fund be set apart for this pur-
pose? Such an application would be lawful and surely
would more nearly correspond to the uses and purposes for

which the fund was originally destined than would an application of the property to the common schools, for which it was never intended.

Congress did not aim to suppress the Mormon religion. It aimed simply at the extirpation of the practice of polygamy, which was one of the tenets of that faith. It recognized that it was and would be lawful for this church to build, repair and maintain places of worship, when it expressly enacted that "No building or the grounds appurtenant thereto which is held and occupied exclusively for the purposes of the worship of God, or parsonage connected therewith, or burial ground, shall be forfeited" (1 Comp. Laws of Utah, p. 118, § 13). And this notwithstanding such property might have become forfeit under the act of 1862.

Should it be said that if the fund were vested in the persons and upon the trusts suggested by us there might be danger of the trust being abused or the funds appropriated to some unlawful purpose, we answer that the trustees would be at all times under the control of the court, and that it would have ample power to correct any such abuse, and to appoint other trustees if those originally chosen should prove unfaithful. See *Chambers* v. *City of St. Louis,* 29 Mo. 546, 588–9.

Then the brief cited Bespham's Equity, § 126, 2 Story's Eq. Jur. § 1176, *Philadelphia* v. *Girard's Heirs,* 45 Pa. St. 9, 3 Am. and Eng. Encyc. Law, 133–4, 4 Kent, 508; *Moore* v. *Moore,* 29 Am. Dec. 417; *Jackson* v. *Phillips,* 14 Allen, 439 and 574 to 596; *Huser* v. *Harris,* 42 Ill. 425. See also *American Academy, etc.,* v. *Harvard College,* 12 Gray, 582; *Attorney General* v. *The Iron Mongers Co.,* 2 M. & K. 576, 588–9; *Attorney General* v. *same,* 2 Beav. 314, 325; *Attorney General* v. *same,* 1 C. & Phil. 207, 220 to 224; *Attorney General* v. *Lawes,* 8 Hare, 32; *Attorney General* v. *Whitechurch,* 3 Vesey 141. As showing with what hesitation the courts depart from the scheme

pointed out by the donor, see 1st Lewin on Trusts, 536; see *Criticism on Attorney General* v. *Dixie,* 1 Boyle on Charities, 162, 165; *Attorney General* v. *Dixie,* 2 M. & K. 342; *Attorney General* v. *Earl of Mansfield,* 2 Russ. 501. And see also the opinion of the Supreme Court of the United States in this case, 136 U. S. 1, at pp. 51, 54, 55, 56, 59, 65.

*Mr. Franklin S. Richards,* also for the defendants.

*Mr. Charles S. Varian, U. S. Attorney,* and *Mr. Joseph L. Rawlins,* for the complainant.

ZANE, C. J.

We are now called upon to designate the objects to which the personal property in the hands of the receiver shall be devoted, and to decide upon the mode of its application. The questions presented for our decision require an examination of the master's report, and the interpretation of congressional enactments designed to suppress polygamy, as well as an application of the doctrine of equity applicable to the rights of property dedicated to charitable uses. This suit is maintained under § 17 of an act in force March 3, 1887, and is as follows: "That the acts of the legislative assembly of the Territory of Utah, incorporating, continuing, or providing for the corporation known as the 'Church of Jesus Christ of Latter-Day Saints,' and the ordinance of the so-called general assembly of the state of Deseret incorporating the Church of Jesus Christ of Latter-Day Saints, so far as the same may now have legal force and validity, are hereby disapproved and annulled, and the said corporation, in so far as it may have or pretend to have any legal existence, is hereby dissolved. That it shall be the duty of the attorney general of the United States to cause such proceedings to be taken in the supreme court of the Territory of Utah as shall be proper to execute the foregoing provisions of this section, and to wind up the affairs of

said corporation conformably to law; and in such proceedings the court shall have power, and it shall be its duty, to make such decree or decrees as shall be proper to effectuate the transfer of the title to real property now held and used by said corporation for places of worship, and parsonages connected therewith, and burial grounds, and of the description mentioned in the proviso to § 13 of this act, and in § 26 of this act, to the respective trustees mentioned in § 26 of this act; and for the purposes of this section said court shall have all the powers of a court of equity.'

Section 13, referred to in the section quoted, made it "the duty of the attorney general of the United States to institute and prosecute proceedings to forfeit and escheat to the United States the property of corporations obtained or held in violation of § 3 of the act of Congress, approved July 1, 1862, entitled 'An act to punish and prevent the practice of polygamy in the territories.'" This section also declared that such property so forfeited and escheated should be disposed of by the secretary of the interior, and the proceeds thereof applied to the benefit of the common schools in the Territory in which such property might. be, and provided that no building, or the grounds appurtenant thereto, held and occupied exclusively in which to worship God, or parsonages connected therewith, or burial grounds, should be forfeited. And § 3, above mentioned, declared that it should not be lawful for any corporation or association, for religious or charitable purposes, to acquire or hold real estate in any territory of a greater value than $50,000, and that all real estate acquired or held by any such corporation or association, contrary to the provisions of the act, should be forfeited and escheated to the United States.

Section 26, also referred to in § 17, is as follows: "That all religious societies, sects, and congregations, shall have the right to have and to hold, through trustees.

21

appointed by any court exercising probate powers in a territory, only on the nomination of the authorities of such society, sect, or congregation, so much real property for the erection or use of houses of worship, and for such parsonages and burial grounds, as shall be necessary for the convenience and use of the several congregations of such religious society, sect, or congregation."

These acts provide that all real estate held by any church for religious or charitable purposes, not used for houses of worship, parsonage, or burial grounds, acquired contrary to the act of 1862, shall be forfeited and escheated to the United States. And they annul the charter of the Church of Jesus Christ of Latter-Day Saints, and provide for winding up its affairs, and for the transfer of its real property, not forfeited and escheated, to trustees appointed by the probate court on the nomination of the authorities of such church. In these enactments Congress recognized the religion of the Latter-Day Saints as lawful, and their church, though disincorporated, as having the right, through trustees selected by its authorities, to own houses in which to worship God and for their ministers to live in. In the second section of the act of 1862 it is declared that it shall be so construed as not to affect or interfere with "the right to worship God according to the dictates of conscience." Upon a hearing of this case on the bill, answer, evidence, and stipulations of the parties, this court held the various sections above mentioned, and the acts referred to, valid, and appointed a receiver to take possession of all real and personal property of the defunct corporation, and to hold the same to be disposed of according to law; and upon a further and subsequent hearing the court made a further decree by which it set apart to the disincorporated body of religious worshippers, block 87 in plat "A." Salt Lake City, known as the "Temple Block," and held the remainder of its real estate, acquired in violation of the third section of the act of 1862, sub-

ject to forfeiture and escheat to the United States; that the personal property of the church, by reason of the dissolution of the corporation, because of the failure or illegality of the trust to which it had been dedicated at its acquisition, and in consequence of its use by the corporation, by operation of law became forfeited and escheated to the United States. From this decree the defendant and the interveners, George Romney and others, on behalf of themselves and all other members of the late corporation, appealed to the Supreme Court of the United States. The latter court affirmed the decree appealed from, except the part relating to the personal property, and held that the personal property could not be appropriated to the purpose to which it had been dedicated because the same was, in whole or in part, contrary to law, or opposed to public policy; that there did not exist any person or persons, natural or legal, legally entitled to any portion of it as successors in interest to the church, and that it had devolved on the United States; and not being lawfully applicable to the purposes to which it was originally dedicated, or for which it had been acquired, and to which at the commencement of this suit it was being devoted by the corporation and its controlling authorities, the same ought to be limited and appointed to such charitable uses, lawful in their character, as should most nearly correspond to those to which it was originally destined, to be ascertained and defined by reference to a master for due examination, inquiry, and report thereon, subject to the approval of the court, and to be established, administered, and carried out in such manner and according to such scheme as may be approved by the court. The case was remanded to this court, with directions to modify its decree as above directed, "and to take such further proceedings as to law and justice may appertain in conformity with the opinion."

In conformity with the opinion of the Supreme Court of the United States and its decree, this case was referred to

the master, and two schemes were presented to him; one, by defendants' solicitors, proposing to vest such personal property in the first presidency of the church, in trust for the relief and assistance of its poor members needing pecuniary aid, and for the erection, repair, and maintenance of houses of worship of people of that faith, and limiting the use to these two purposes. The other scheme, proposed by the solicitors of the United States, would vest this property in a commissioner appointed by the court, to be used by him for the benefit of the public schools of the Territory. The master has reported this last plan, and recommends its approval by the court; to which the defendants' solicitors object, and ask us to approve their scheme; and plaintiff's solicitors insist upon the approval of the one recommended by the master.

Behind the legal title to the funds in controversy in the late corporation lie beneficial rights belonging to natural persons. Out of the confidence reposed in the church officials who controlled them, an obligation arose that they would faithfully apply these funds according to the general understanding of their contributors. The Supreme Court of the United States, in its opinion directing these proceedings, said: "The property in question has been dedicated to public and charitable uses. It matters not whether it is the product of private contributions made during the course of half a century, or of taxes imposed upon the people, or of gains arising from fortunate operations in business or appreciation in values; the charitable uses for which it is held are stamped upon it by charter, by ordinance, by regulation, and by usage, in such an indelible manner that there can be no mistake as to their character, purpose or object." *Late Corporation, etc., of Church of Latter-Day Saints* v. *U. S.,* 136 U. S. 50, 10 Sup. Ct. Rep. 792. In its opinion the court does not distinguish and consider singly and separately the various charitable objects to which the property in controversy was dedi-

cated. In fact the inquiry by the trial court had not gone that far; they were considered in a lump, so to speak, and the whole lump appears to have been regarded as tainted with polygamy. The court on appeal could not look at the merits of each object of charity separately, because the findings or the evidence did not disclose the objects singly or their peculiar merits. In his inquiry the master advanced, and we are permitted to see. the objects to which the fund had been devoted. In the light of the evidence reported by him we can distinguish the good from the bad, the worthy from the unworthy, and understand to which and in what proportions the church authorities had applied the fund before it was taken out of their hands. It appears from the evidence reported by the master that George Q. Cannon testified that he was first counselor to Wilford Woodruff, president of the church, and that he was familiar with the purposes for which contributions creating the fund were made for many years; that they were voluntarily made for religious and charitable purposes; that appropriation and distribution of it was left to the first presidency, and the proceeds were expended on temples and places of worship, and for the poor, and such charitable objects as arose; that the first presidency, in their appropriations of this fund, were limited to church purposes; that the custom has been for the first presidency to submit to the semi-annual conference of the church a report showing the appropriations and their purposes, and such reports were approved by that body. This testimony was corroborated by the testimony of other officers of the church, and there was no evidence contradicting it.

The master in his report states that the "allegations that, ever since the organization of the church, and down to the time when the fund was taken possession of by the receiver herein, the fund has been managed, controlled, and disbursed by and under the direction of the first presidency of the church, and was devoted and

applied solely to the religious and charitable uses in which the church and the members thereof were interested; that much the larger part of the fund had, prior to March 3, 1887, been devoted to the building of temples, meeting houses, and other places of worship for the members of the church, and for the relief of its poor and distressed members, their families, and to the widows and orphans of such members who were in needy and distressed circumstances,—were in the main supported by the evidence adduced before him." It also appears from the testimony that about $75,000 per annum had been appropriated out of this fund to assist the poor, previous to the time it was placed in the hands of the receiver, and about $50,000 per annum to the erection and repair of places of worship, and that as much will be required in the future. The money and personal property in the hands of the receiver, and to be disposed of by the court, is about $400,000. The money donated to assist and relieve the poor, and erect places of worship, and maintain and repair them, is for charitable uses. The statute of 43 Eliz. c. 4, is regarded as the highest standard by which to determine charitable uses and purposes. Among the objects mentioned in that act as charitable is "relief for the aged, impotent, and poor people;" donations for "schools of learning, free schools, repair of churches;" and for "aid or ease of any poor inhabitants;" and for "house of correction." Many other purposes and objects are mentioned as charitable in this statute. The statute has been liberally construed by the courts. In the case of *Jackson* v. *Phillips*, 14 Allen, 554, the court said: "Charities are not confined at the present day to those which were permitted by law in England, in the reign of Elizabeth. A gift for the advancement of religious or other charitable purpose in a manner permitted by existing laws is not the less valid by reason of having such an object as would not have been legal at the time

of the passage of the statute of charitable uses. For example, charitable trusts for dissenters from the established church have been uniformly upheld in England since the toleration act of 1 W. & M. c. 18, removed the legal disabilities under which such sects previously labored. *Attorney General* v. *Hickman,* 2 Eq. Cas. Abr. 193; *Loyd* v. *Spillet,* 3 P. Wms. 344, 2 Atk. 148; *Attorney General* v. *Cock,* 2 Ves. Sr. 273. And in this country, since the revolution, no distinction has been made between charitable gifts for the benefit of different religious sects."

While the master finds, in substance, that the fund was devoted and applied by the church solely to the religious uses of the church, and much the larger part of it to places of worship for its members, and to the relief of its poor and distressed members and their families, and to widows and orphans of such members in needy and distressed circumstances, he reached the conclusion "that all the uses to which this property had been applied rested under the condemnation of the decree of the Supreme Court of the United States; that it had been adjudicated that the property cannot go back to any of such uses." If this conclusion as to the effect of that decree is correct, then the scheme proposed by which the fund would be devoted alone to assist poor, distressed and needy members of the church, its widows and orphans, and to aid in the construction and repair of its houses of worship, must be denied. The court having found in its decree that the uses and purposes to which the fund in question had been dedicated, were, in whole or in part, opposed to public policy, good morals, and contrary to the laws of the United States, said: "And not being lawfully applicable to the purposes for which it was originally dedicated or acquired, and to which at the commencement of this suit it was being devoted by the corporation and its controlling authorities, the same

ought to be limited and appointed to such charitable uses, lawful in their character, as most nearly correspond to those to which it was originally destined." The court did not mean to say that the assistance of the poor and distressed members of the church, and aid and comfort to the widows and orphans of its members, were opposed to public policy, good morals, and contrary to the laws of the United States. The decree concludes: "Wherefore it is * * * decreed that the cause be remanded to the supreme court of the Territory of Utah, with directions to modify its decree as herein directed, and to take such further proceedings as to law and justice may appertain, in conformity with the opinion of this court." *Late Corporation, etc., of Church of Latter-Day Saints v. U. S.,* 140 U. S. 665, 11 Sup. Ct. Rep. 884. This decree must be construed in the light of the opinion of the court, ordering and making the decree. Id. 136 U. S. 50, 10 Sup. Ct. Rep. 792. The court used the following language in its opinion: "But it is also stated in the findings of fact, and is a matter of public notoriety, that the religious uses intended to be subserved and promoted are the inculcation and spread of the doctrines and usages of the Mormon church, one of the distinguishing features of which is the practice of polygamy, a crime against the laws and abhorrent to the sentiments and feelings of the civilized world." And after stating that the church, in defiance of law, was persevering in propagating this doctrine, and condemning it in unmistakable language, the court continued: "The question therefore is whether the promotion of such a nefarious system and practice, so repugnant to our laws and to the principles of our civilization, is to be allowed to continue by sanction of the government itself, and whether the funds accumulated for that purpose shall be restored to the same unlawful uses as heretofore, to the detriment of the true interests of civil society." In substance, the court said

that the fund was used to promote and spread the doc-
trines and usages of the church, one of the distinguish-
ing features of which was the practice of polygamy, and
that to return it to the authorities of the church, or to
Romney and others, interveners, on behalf of all its
unincorporated members, as they asked, to be appropri-
ated and used without limitation, would be, in effect, to
sanction such unlawful use of the fund for the same
unlawful purpose, — the propagation of polygamy. It
understood that this fund was used to propagate and
spread the doctrines and usages of the church, and that
polygamy was one of those doctrines, and its practice was
one of its usages. The court did not undertake to dis-
tinguish the lawful purposes of the church from the one
that was unlawful; it was not asked by the parties, or
either of them, to do that.

Referring to the law of March 3, 1887, the court said:
"The only question we have to consider in this regard is
as to the constitutional power of Congress to pass it. Nor
are we now called upon to declare what disposition ought
to be made of the property of the Church of Jesus Christ
of Latter-Day Saints. This suit is in some respects an
auxiliary one instituted for the purpose of taking posses-
sion of and holding for final disposition the property of
the defunct corporation in the hands of a receiver, and
winding up its affairs. To that extent, and to that only,
the decree of the supreme court of the Territory has
gone." The opinion concludes: "The application of Rom-
ney and others, representing the unincorporated members
of the Church of Jesus Christ of Latter-Day Saints, is
fully disposed of by the considerations already adduced.
The principal question discussed has been whether the
property of the church was in such a condition as to
authorize the government and the court to take possession
of it, and hold it until it shall be seen what final disposi-
tion of it should be made; and we think it was in such a

condition, and that it is properly held in the custody of
the receiver. The rights of the church members will
necessarily be taken into consideration in the final disposi-
tion of the case. There is no ground for granting their
present application. The property is in the custody of the
law awaiting the judgment of the court as to its final dis-
position, in view of the illegal uses to which it is subject
in the hands of the Church of Latter-Day Saints, whether
incorporated or unincorporated. The conditions for claim-
ing possession of it by members of the sect or community
under the act do not at present exist." The court held
that it was not then called upon to declare what disposi-
tion ought to be made of the fund; that the principal
question considered by it was whether the property of the
church was in such a condition as to authorize the court
to take possession of it by its receiver, and hold it until
it should be seen what final disposition should be made of
it; that the property was in the custody of the law await-
ing final disposition by the court, in view of the illegal
uses to which it was subject in the hands of the church
authorities, whether incorporated or unincorporated; that
the conditions for claiming possession of it by the mem-
bers of the Mormon sect or community did not then exist;
that their rights would necessarily be taken into considera-
tion in the final disposition of the case; and that there
was no ground for granting their application, as then
made, at that time. In this there is nothing to indicate
that the court understood that the rights of the unincor-
porated members of the church were barred by its decree.
In fact, the court expressly said that their rights would
necessarily be taken into consideration in the final disposi-
tion of the case; rights determined by the decree could
not be taken into consideration afterwards. The case was
remanded, and the territorial court was directed to refer
the questions as to the rights of the church and its mem-
bers and all others to the fund to a master for examina-

tion and inquiry as to their rights under the conditions
existing at the time of the inquiry, and for the suggestion
of a scheme or mode by which it could be "limited and
appointed to such charitable uses, lawful in their char-
acter, as might most nearly correspond to those to which
it was originally destined." We cannot concur in the con-
clusion of the master that the supreme court in its decree
condemned all the uses to which the fund had been dedi-
cated, and that it forbids the application of any part of
it to any of them. It appears from the opinion that
polygamy was the only object that the court found to be
unlawful, and we cannot believe that it intended to con-
demn all the worthy purposes of the church beeause of
this unlawful one. Did the virus of this permeate every
charitable purpose of the Mormon people? One of the
charities to which this fund was appropriated was the
assistance and relief of the poor of the church; another
was the erection and repair of houses of worship. The
decree cannot be construed to condemn those purposes,—
to condemn those qualities as vicious in the Latter-Day
Saints that we regard as virtues in other people. We are
of the opinion that the decree of the Supreme Court of
the United States in this cause does not forbid us from
limiting and appointing this fund to any charitable use
that is lawful, within the scope of the purpose to which it
was originally dedicated.

We will now consider the two schemes presented for our
consideration and adoption. Neither of them is unlawful
or opposed to public policy or immoral. The scheme that
would devote the fund to the aid and assistance of the
poor members of the church and their families, and to
the erection and repair of its places of worship, would
limit it to objects within the scope of the intentions of
its donors. The other would devote and appoint it to a
use not intended by its donors, and to which it was not
dedicated. This brings us to the question, can the court

appropriate this fund to a charitable object not intended by its contributors, and to which it had not been dedicated? The court said, in its opinion remanding this case: "It is obvious that any property of the corporation which may be adjudged to be forfeited and escheated will be subject to a more absolute control and disposition by the government than that which is not so forfeited. The non-forfeited property will be subject to such disposition only as may be required by the law of charitable uses, while the forfeited and escheated property, being subject to a more absolute control of the government. will admit of a greater latitude of discretion in regard to its disposition." The legal title and all equitable rights to the real estate forfeited and escheated, because held contrary to the law of 1862, vests in the government, to be dealt with and disposed of according to law; while the personal property cannot be so forfeited and escheated, and it must be disposed of according to the law of charities. While the decree gave the possession and custody of the personal property to the receiver, to be held subject to the further order of the court, the use was to charitable objects, lawful in their character, within the general intent of the donors. The opinion does not say that the control over the personal property is absolute,—that it was regardless of the purposes of its dedication. The court further said in the same opinion: "The principles of the law of charities are not confined to a particular people or nation, but prevail in all civilized countries pervaded by the spirit of christianity. * * * A leading and prominent principle prevailing in them all is that property devoted to a charitable and worthy object, promotive of the public good, shall be applied to the purpose of its dedication, and protected from spoliation and from diversion to other objects. Though devoted to a particular use, it is considered as given to the public, and is therefore taken under the guardianship of the law. If it cannot be applied to the

particular use for which it was intended, either because
the objects to be subserved have failed, or because they
have become unlawful, and repugnant to the public policy
of the state, it will be applied to some object of kindred
character, so as to fulfill, in substance, if not in manner
and form, the purpose of its consecration." In illustration
of the application of the principle the court quotes from
the opinion of Lord Chief Justice WILMOT, in his opinion
in *Attorney General* v. *Downing*, 1 Wilm. 32: "But where
property is given to mistaken charitable uses this court
distinguishes between the charity and the use; and seeing
the charitable bequest in the intention of the testator,
they execute the intention, varying the use as the king,
who is the curator of all charities, and the constitutional
trustee for the performance of them, pleases to direct and
appoint." In this it is not stated that a court of equity,
in the exercise of its ordinary jurisdiction, could vary the
use to objects outside of the intention of the donors; but
it does say "varying the use as the king pleases to direct
and appoint." And after citing cases from various coun-
tries, many from England and our own land, in illustra-
tion of the doctrine of *cy pres*, the court continues: "The
true ground is that the property given to a charity becomes
in a measure public property, only applicable, as far as
may be, it is true, to the specific purposes to which it is
devoted. * * * Hence, when such property ceases to
have any other owner, by the failure of the trustees, by
forfeiture for illegal application, or for any other cause,
the ownership naturally and necessarily falls upon the
sovereign power of the state; and thereupon the court
of chancery, in the exercise of its ordinary jurisdic-
tion, will appoint a new trustee to take the place of the
trustees that have failed or that have been set aside, and
will give directions for the further management and
administration of the property; or if the case is beyond
the ordinary jurisdiction of the court, the legislature may

interpose and make such disposition of the matter as will accord with the purposes of justice and right. The funds are not lost to the public as charity funds; they are not lost to the general objects or class of objects which they were intended to subserve or effect."

In this the court says that, when such property ceases to have any other owner by the failure of the trustees for any cause, the court of chancery, in the exercise of its ordinary jurisdiction, will appoint new trustees; or if the case is beyond the ordinary jurisdiction of the court, the legislature may interpose and make such disposition of the matter as will accord with the purposes of justice and right. If a person holding the legal title of property for the use of another, or others, refuses to discharge the obligation arising out of the confidence reposed in him to apply it according to the trust, or if he forfeits his right to do so for any cause, the court, in the exercise of its ordinary jurisdiction, will appoint another trustee. This jurisdiction termed "ordinary" is confined to the selection of the instrument to apply the property to the object; it does not extend to the selection of a new object to which to apply the funds. The ordinary jurisdiction is here limited to the mode; but if the case is beyond that, the opinion says the legislature may interpose to prevent the funds from being lost to the general objects or class of objects which they were intended to subserve, and in so doing may make such disposition of the matter as will accord with justice and right. In the opinion from which we have been quoting the court defined the powers of the government to deal with the real estate forfeited and escheated to it, and also its authority with respect to the property not so forfeited and escheated. The court also discussed the power of the government, through its courts of equity, in the exercise of their ordinary jurisdiction, and its authority through the sovereign in monarchical governments, and also its authority as

expressed in enactments of the lawmaking department in a republic. It requires a careful examination of the opinion to distinguish the powers held to be applicable to the forfeited and escheated property from those applying to the property not forfeited and escheated; and also to distinguish the powers held to pertain to the court, in the exercise of its ordinary jurisdiction, with respect to property dedicated to charitable uses, from those belonging to the sovereign, in a monarchy, with respect to such property, or to the lawmaking department in a government based upon the will of the people,—one in which they are sovereign. In *Jackson* v. *Phillips*, 14 Allen, 539, a testator "bequeathed two sums to trustees,—one for the preparation and circulation of books, newspapers, the delivery of speeches, and such other means as in their judgment" would "create a public sentiment" as would "put an end to negro slavery in this country;" and the other for the benefit of "fugitive slaves" who might "escape from slave-holding states." After his death slavery was abolished by the thirteenth amendment to the constitution of the United States. Held, "that these charitable bequests should be applied to carry out the intentions of the testator as nearly as possible, according to a scheme to be settled by a master and approved by the court." The master reported that "both sums should be paid over to the trustees, the first to be paid by them from time to time to an association already established to promote the education, support, and interest of the freedmen, lately slaves, in those states in which slavery had been so abolished; and the second sum (being of small amount) to the use of necessitous persons of African descent in the city of Boston and its vicinity, preference being given to such as had escaped from slavery." The purpose of the first bequest was the liberation of negro slaves, and the purpose of the second was to assist such as might escape from slaveholding states. The general

purpose was aid to negro slaves. And these slaves having been liberated, the court held that the sum should be devoted to their use and benefit as freedmen, except a small portion to be used for the benefit of necessitous persons of the same race in Boston and its vicinity. While the mode prescribed by the testator for benefiting the negro slaves by securing their liberation, and by aiding those who had escaped from slavery, was necessarily abandoned, the general object of the bequest was not. The court devoted it to their use as freedmen and to needy persons of the same race in a particular locality. In this decision the court went to the verge of its jurisdiction. In the same opinion the court said: "This power of disposition by the sign manual of the crown in direct opposition to the declared intention of the testator, whether it is to be deemed to have belonged to the king, as head of the church as well as of the state, intrusted and empowered to see that nothing be done to the disherison of the crown or the propagation of a false religion (*Rex* v. *Portington,* 1 Salk. 162, 1 Eq. Cas. Abr. 96), or to have been derived from the power exercised by the Roman emperor, who was sovereign legislator as well as supreme interpreter of the laws (Dig. 33, 2, 17; Id. 50, 8, 4; Code, lib. 1, tit. 2, c. 19; Id. lib. 1, tit. 14, c. 12), is clearly a prerogative and not a judicial power, and could not be exercised by this court; and it is difficult to see how it could be held to exist at all in a republic, in which charitable bequests have never been forfeited to the use or submitted to the disposition of the government because superstitious or illegal. 4 Dane, Abr. 239; *Gass* v. *Wilhite,* 2 Dana, 176; *Methodist Church* v. *Remington,* 1 Watts, 226." In the same opinion the court said, further: "It is accordingly well settled by decisions of the highest authority that, when a gift is made to trustees for a charitable purpose, the general nature of which is pointed out, and which is lawful and valid at the time

of the death of the testator, and no intention is expressed to limit it to a particular institution or mode of application, and afterwards, either by change of circumstances the scheme of the testator becomes impracticable, or by change of law becomes illegal, the fund, having once vested in charity, does not go to the heirs at law as a resulting trust, but is to be applied by the court of chancery, in the exercise of its jurisdiction in equity, as near the testator's particular directions as possible, to carry out his general charitable intent." The court expressly said that, when the gift is for a charitable purpose, the general nature of which is pointed out, and no intention is expressed to limit it to a particular institution or mode of application, and afterwards the scheme of the testator becomes impracticable or illegal, the fund must be applied by the court as near the testator's particular direction as possible, to carry out his general charitable intent. The court cannot select any object of charity outside the scope of the general intent.

The doctrine of *cy pres* is only a liberal rule of construction to ascertain the intention of the donor, and all the rules relating thereto are intended to aid in ascertaining and carrying out, as nearly as may be, the true intention of the donor. His intention should be the aim of the court. "The difference between the crown and the court is this: The court is governed by known judicial rules of interpretation; the crown is governed by its own good will and pleasure in deducing or imparting such intentions as it sees fit." 2 Perry, Trusts, § 727. In discussing the doctrine of *cy pres*, in its opinion in the case of *Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 354, after referring to the prerogative of the king as *parens patriæ* as to gifts to charitable uses, the court said: "And this regal prerogative with some other curative powers inherent in the crown, was delegated to the chancellor of England in his.

ordinary ministerial capacity as the keeper of the great seal and official organ of the king." And then, after remarking that we have no such officer in the United States as the chancellor of England, that our chancery courts have no other jurisdiction than that of courts of equity, and no other power than that which is judicial or regulated by law, said, further, that: "We do not admit that the commonwealth, as *parens patriæ,* can rightfully interfere unless there be an escheat to her; and then she may become absolute and beneficial owner. Rights here are regulated by law. * * * We are satisfied that the *cy pres* doctrine of England is not, or should not be, a judicial doctrine, except in one kind of case; and that is where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal, or inappropriate, or which happens to fail, has been prescribed. In such a case, a court of equity may substitute or sanction any other mode, that may be lawful and suitable, as will effectuate the declared intention of the donor, and not arbitrarily and in the dark, presuming on his motives or wishes, declare an object for him. A court may act judicially as long as it effectuates the lawful intention of the donor, but it does not act judicially when it applies his bounty to a specific object of charity, selected by itself merely because he had dedicated it to charity generally, or to a specified purpose which cannot be effectuated; for the court cannot know or decide that he would have been willing that it should be applied to the object to which the judge, in the plenitude of his unregulated discretion and peculiar benevolence, has seen fit to decree its appropriation, whereby he, and not the donor, in effect and at last, creates the charity." This doctrine was reaffirmed in *Curling's Adm'rs* v. *Curling's Heirs,* 8 Dana, 38, the court holding that property dedicated by the donor to a certain charity could not be diverted or appointed by the court to any other object,

and, if property is devised in such general terms that it may be devoted to one or more of several charities, it cannot be devoted by the court to any object not embraced in such general terms; and said that by doing so the court might apply the charity to an object which the donor did not intend it, and to which he never would have devoted it. *Gilman* v. *Hamilton,* 16 Ill. 225, holds that the court cannot change the charity to any object not intended by the donor. In *City of Philadelphia* v. *Girard's Heirs,* 45 Pa. St. 9, the court said, "In all gifts for charitable uses the law makes a very clear distinction between those parts of a writing conveying them, which declares the gift and its purposes and those which direct the mode of its distribution." In the same opinion the court further said: "And this is the doctrine of *cy pres,* so far as it has been expressly adopted by us, not the doctrine 'grossly revolting to the public sense of justice' (*Methodist Church* v. *Remington,* 1 Watts, 226), and 'carried to the extravagant length that it was formerly' in England (*Witman* v. *Lex,* 17 Serg. &. R. 93), by which an unlawful and entirely indefinite charity was transformed by the court or the crown into one that was lawful and definite, though not at all intended by the donor or testator; but a reasonable doctrine by which a well-defined charity, or one where the means of definition are given, may be enforced in favor of the general intent, even where the mode or means provided by the donor fail by reason of their inadequacy or unlawfulness."

From these authorities we may deduce the general rule that courts of equity, in the exercise of their ordinary jurisdiction, cannot devote any portion of a fund dedicated to charitable uses to any object not contemplated by the donor; that when property is given to a class of objects in general terms, and also directed to be applied to one of them in special terms, if its application to that one becomes unlawful or impracticable, the doctrine of *cy pres*

authorizes. the court to devote it to one or more of those embraced in the general intent most analogous to the one specially named; that the general intent may not be expressed in explicit terms if the devise or dedication in the light of the circumstances authorize the court to infer that such was the donor's wish in that event.   The same rules apply when the charity is the result of contributions by a large number of people.   It is plain from the evidence before us that the members of the Church of Jesus Christ of Latter-Day Saints contributed the fund in dispute, expecting and wishing it to be applied by the first presidency to church purposes,— to objects promoted by the church. We cannot find from the evidence before us that the Mormon people who contributed this fund intended or expected that the fund or any part of it would be appropriated to the support of the common schools of the Territory.   In common with non-Mormons the Latter-Day Saints are taxed to maintain the public schools, and to take the money that they contributed for church purposes, and devote it also. to their support, would be unequal and unjust.   Were it simply a matter of discretion with us we would not be disposed to assume superior and peculiar wisdom, and say to these people that "we will devote the contributions made by you for church purposes to a purpose that you did not intend it,—to the support of the common schools, —because we think that a more worthy object."  We cannot adopt the scheme presented by the plaintiff and reported by the master.

We will now consider the scheme for the application of this fund presented by the defendants.   Their plan would vest this property in the first presidency. of the church, now consisting of Wilford Woodruff, its president, and George Q. Cannon and Joseph F. Smith, his counselors, and their successors in office, in trust, to apply the proceeds thereof and to limit its use to the relief and assistance of the poor of the church, and to the building and

repair of convenient and necessary places of worship for its members. It appears from the evidence before us that this fund was very largely applied to these two objects by the first presidency prior to the time it.was taken from their possession and control. But we are also authorized to infer that at the time this case was tried in 1888, and prior thereto, the teachers of the church and its missionaries taught by its authority that the practice of polygamy was right, and that the church in that way propagated it, and that a portion of the property in dispute was used to aid and support such teachers and missionaries, and in that way was applied to an immoral and unlawful end. The scheme under consideration, however, would forbid the use of this fund for any such purpose; it requires it to be used for the benefit of needy members, and to be applied to the erection of houses of worship for the Latter-Day Saints. The relief of the needy and distressed of whatever faith cannot be immoral or unlawful. Nor can we say that the expenditure of money for the erection and repair of convenient and necessary houses of worship for the Mormon people is devoted to an immoral or unlawful purpose. In the legislation of congress with respect to polygamy, houses of worship, parsonages, and burial grounds are reserved to the church, and the decision remanding this case affirms so much of the decree of the trial court as set such property apart to the church.

We now come to another question: Can this court, in the exercise of its ordinary chancery jurisdiction, vest this fund in the first presidency to be applied to the two purposes that we have seen are lawful? This property, as the evidence shows, was given to the church authorities named, to be applied to church purposes in their discretion. Assuming that a portion of it was so expended by such authorities as to propagate polygamy, can the court now limit the proceeds of the entire fund to the relief of the

poor and the erection and repair of houses of worship,— two lawful objects, and the ones to which the larger portion of the fund had been devoted? We may presume that the contributors expected and intended that the first presidency would apply their gifts to such purposes as they might deem practicable and right, and, if they should deem any object impracticable and wrong, that they would devote the whole of it to such of the objects deemed practicable and right. The church authorities now propose to apply the entire fund to the two purposes named, which must be conceded practicable and lawful, and they, on behalf of the entire sect, pray the court to decree that they shall devote it to these two lawful purposes, and that they may be prohibited from applying it to any other. In the case of *Jackson* v. *Phillips, supra,* the court said: "When a charitable intent appears on the face of the will, but the terms used are broad enough to allow of the fund being applied either in a lawful or an unlawful manner, the gift will be supported, and its application restrained, within the bounds of the law." When the dedication is broad enough to allow the trustee to apply the fund to unlawful as well as lawful purposes, the court will limit its application to the lawful ones. When the terms of the gift authorize the trustees to devote the fund to either of two objects,— one legal and the other illegal,— its application will be confined to the legal purpose, and the illegal one will be rejected. " The principle of these cases seems to be the same,— that, although a valid charitable use should happen to be joined by way of alternative with one which is invalid, no matter how, the manner being altogether indifferent, the former will not be prejudiced by its connection with the latter." Boyle, Char. p. 232. There is English authority entitled to great weight, to the effect that if a testator gives one charitable fund to two or more objects in definite proportions, and one fails, the other objects that have not failed may be substituted for the

one that has, and the entire fund may be devoted to them,. unless the terms of the will exclude such an application. In the case of *Attorney General* v. *Ironmongers' Co.,* 7 Eng. Ch. 578, Lord Chancellor BROUGHAM said: "When a testator gives one charitable fund to three several classes of objects, unless he excludes by most express provisions. the application of one portion to the purpose to which the others are destined, it is clear that the court may thus. execute his intention in the event of an impossibility of applying that portion to its original destination. The character of charity is impressed upon the whole fund. There is good sense in presuming that, had the testator known that one object was to fail, he would have given its appropriate fund to the increase of the funds. destined to the objects of his bounty; and there is convenience in acting as he would himself have done. This is. the foundation of the doctrine of *cy pres.*" This case was afterwards before the court when COTTENHAM was lord chancellor, and in considering the rule of construction in such cases, he said: "It is obviously true that, if several charities be named in a will, and one fail for want of object, one of the others may be found to *cy pres* to that which has failed; and, if so, its being approved by the testator ought to be an additional recommendation; but such other charity ought not, as I conceive, to be preferred to some other more nearly resembling that which has failed." In such a case the weight of authority in this country, as. we think, is that the amount specially directed to be applied to the object that fails will be devoted to any other, whether expressly named in the will or dedication. or not so named, if the terms of the will or dedication, in the light of the circumstances, authorize the court to infer that such an application is within the general intent of the testator or donor. But the case of *Attorney General* v. *Ironmongers' Co.,* is not analagous to the one in hand. In that the trustee was directed to apply one-half

of the estate to one object and the other half to two other objects in equal proportions, so that it was necessary to apply the portion which the testator had expressly devoted to the object that failed to other objects; it was necessary to substitute another or other objects.

It appears from the evidence before us that the contributions to the fund in controversy were made with the understanding that they should be applied to church purposes, but that it was optional with the first presidency to which object, and, if to more than one, the amount to each. The donations were to all or any, as those church officers might determine, and the court is asked to limit the application to two church purposes that are lawful. We have no doubt that this court, in the exercise of its ordinary chancery jurisdiction, may limit the application of this fund to the lawful purposes. Defendants' solicitors also insist that the report of the master and accompanying evidence show that the church abandoned the practice of polygamy by means of, and in obedience to, the manifesto of its president and a resolution of its general conference adopted on the 6th of October, 1890. In that manifesto, which is in evidence, the following language is found: "We are not teaching polygamy or plural marriage, or permitting any person to enter upon its practice.   *   *   * Inasmuch as laws have been enacted by Congress forbidding plural marriages, which laws have been pronounced constitutional by the court of last resort, I hereby declare my intention to submit to those laws, and to use my influence with the members of the church over which I preside to have them do likewise.   *   *   *   And I now publicly declare that my advice to the Latter-Day Saints is to refrain from contracting any marriage forbidden by the law of the land." And the resolution adopted by a general conference of the church, on motion of Apostle Lorenzo Snow, is: "I move that, recognizing Wilford Woodruff as the president of the Church of Jesus Christ

of Latter-Day Saints, and the only man on earth at the present time who holds the keys of the sealing ordinances, we consider him fully authorized by virtue of his position, to issue the manifesto which has been read in our hearing, and which is dated September 24, 1890; and that, as a church in general conference assembled, we accept this declaration concerning plural marriage as authoritative and binding." It appears from the evidence reported by the master that Wilford Woodruff, the president of the church, testified that his object in issuing the manifesto was "to announce to the world that the plural marriage had been forbidden by the church, and that it could not be practiced thereafter; that it was presented to the quorum of the twelve apostles, and accepted by them; that it was afterwards presented to the officers and members of the church assembled at their sixtieth semi-annual conference on October 6, 1890; that the conference received and adopted it by a unanimous vote; that there were present about ten thousand officers and members. The representation was a fair one * * * from the whole Territory * * * and other places." The witness further testified, in substance, that he has never heard of any opposition to it or dissent from it by any member of the church; that to the best of his knowledge the members of the church willingly accepted and adopted it; that it would be contrary to the law of the church for any member of it to enter into or contract a plural marriage; that any person entering into plural marriage after that date would be liable to excommunication from the church; that there has not been any polygamous or plural marriage entered into or contracted by any member of the church, to his knowledge, since the date of the manifesto; that he has not since that date assented to the practice of polygamy in any way or manner, and that he does not know of any other officer of the church that has; that he does not have any hope or expectation that the practice of polygamy will ever

be re-established in the future; that all revelations that the church has were accepted by a vote; that he believes in the principle of polygamy, and presumes the members of the church do; that a principle may be believed in as a true one and still not be practiced; that a failure of any member to follow the manifesto would become a subject of church discipline; that the intention of the manifesto was to require obedience to all the laws; that he issued the manifesto by inspiration, and that he believed it was his duty to do so; that the manifesto and the resolution is the law of the church,—"the law of God to us; we are required to abandon that doctrine or tenet of our faith in our practices." He was asked: "Question. President Woodruff, do you believe that the principle of plural marriage was revealed to the church through Joseph Smith from the Almighty? Answer. I do. Q. Do you believe that the Almighty has revealed to the church, through you, that it is discontinued and abandoned? A. I do. Q. You believe that? A. Yes, sir." The witness further answered: "My view is that inspiration is revelation." The witness further testified, in substance, that the manifesto also prohibited the practice of unlawful cohabitation. Other witnesses holding high official positions in the church corroborated the testimony of its president, and there is no evidence before us tending to prove that any of the church authorities, or that, with their consent, any of its members, since the date of the manifesto, have to their knowledge taught, advised, counseled, or consented to the practice of polygamy or unlawful cohabitation. If the uncontradicted testimony and evidence before us can be relied upon, it proves that the church authorities and its members regard the manifesto and its resolution of October 6, 1890, as prohibiting the practice of polygamy, and that they regard this prohibition as the law of God to them; that within the pale of civilization where laws exist against it, the practice of polygamy is wrong, but that outside of this limit it may

be rightfully practiced.  Assuming that they believe that the Supreme Lawgiver, in a revelation to Joseph Smith, the then head of the church, sanctioned polygamy, and in another revelation, about forty years afterwards, to Wilford Woodruff, then its head, prohibited its practice within the limits mentioned, it follows that they believe that the Lawgiver sanctions polygamy where the sentiments of civilization are not against it, and where it is not prohibited by law; but that, where such sentiments and laws are against it, it is wrong; that the Almighty regards the sentiments of civilization and the will of human lawmakers, as expressed in obedience to their reason and consciences, as binding on the people within their jurisdiction; that he requires obedience to the law of the land.  The theory of civil or municipal government as expressed in the Declaration of Independence is that it is based upon the will of the people expressed according to the dictates of their reason and conscience.  This theory the most of us believe in, and, if the Mormons are right, God has in a revelation to them recognized and sanctioned this theory as sound. Assuming that there is a Supreme Being, who is the source of all power and wisdom, many of us believe He does so express His will, so far as human governments go, through the reason and conscience of mankind in constitutions and laws.

Importance is attached by the master in his report to, and counsel lay stress upon, the statement of the president, that polygamy is right, but that it is wrong to practice it when the sentiments of the people and municipal law are against it.  According to his statement he has an abstract belief in polygamy where laws exist against it, but that it is wrong to practice it; in other words, he believes in the principle in the abstract under such circumstances, but does not believe in it in the concrete.  The government is not authorized to deprive any person of his property against his will, except by

forfeiture or escheat according to law, or by appropriating,it to the payment of public taxes in the mode the law prescribes, or in pursuance of the law of eminent domain, with just compensation. It cannot divest any individual or any class of the people of their property, or deny to them the right to control it or to devote it to any object they may choose, simply because they may entertain wrong political or religious beliefs. The doing of either would be a plain violation of those principles of civil and religious liberty which underlie our whole political system. The intent and the resulting act may together be defined as crime and punished; but the intent alone cannot be. The perceptions, the feelings, the beliefs, or the consciences of mankind cannot be regulated by human laws. Such laws would transcend the power of all just governments. We do not feel authorized to withhold from the Latter-Day Saints the right to devote their property to charitable objects, simply because we may think they have wrong beliefs; or to undertake the eradication of such beliefs by denying to them the right to the enjoyment of their property, or the right to appropriate it to lawful purposes. Polygamy having been abandoned by the church, the remaining purposes to which the personal property in question has been dedicated, and to which it may be applied by the church, appear to be lawful. And in view of this, the writer of this opinion is unable to understand upon what principle of law this court can deny to this church the right to appropriate and apply this fund to such purposes. He is of the opinion that it should be vested in Wilford Woodruff, George Q. Cannon, and Joseph F. Smith, its first presidency, and in their successors in office, the agents selected by the church, to be devoted and applied by them to those purposes according to the will of the church and the wishes of its donors. A majority of the court, however, is of the opinion that it should be vested in a

trustee selected by the court, and in his successor or successors, to be appointed by the court, to be devoted exclusively to the support and aid of the poor of the church and to the building and repairing of its houses of worship; and that he should be required to give a bond before entering upon his duties sufficient to secure the amount that may come to his hands, and his performance of the duties of the trust; and that he should be required to report to the court on the 1st day of January of each year his action as such trustee. A decree will be entered by the court in accordance with this opinion.

BLACKBURN, J., and MINER, J., concurred.